James C. Shah (SBN #260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN #279834)
Email: kctang@millershah.com
**MILLER SHAH LLP**
8730 Wilshire Blvd., Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

Nicholas R. Lange (*pro hac vice* forthcoming)
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
nlange@fklmlaw.com

[Additional counsel on signature page]

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

|  |  |
|---|---|
| JEFFREY LAWRENCE SINGER and TINA ARCHER SANTUCCI, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>COMSCORE, INC., a Delaware corporation, and FULL CIRCLE STUDIES, INC., a Delaware corporation,<br><br>*Defendants.* | Case No.: 2:26-cv-01108<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **Violation of Cal. Penal Code § 631**<br>2. **Violation of Cal. Penal Code § 638.51**<br>3. **Violation of Cal. Penal Code § 632**<br>4. **Violation of Cal. Penal Code § 502**<br>5. **Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511,** *et seq.*<br>6. **Violation of the California Constitution Art. 1, § 1**<br>7. **Violation of Cal. Bus. & Prof. Code § 17200,** *et seq.*<br>8. **Common Law Invasion of Privacy – Intrusion Upon Seclusion**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Jeffrey Lawrence Singer and Tina Archer Santucci ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint and Demand for Jury Trial against Defendants Comscore, Inc. and Full Circle Studies, Inc. (collectively, "Defendants" or "Comscore") for surreptitiously collecting consumers' web browsing activities. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief.

### NATURE OF THE ACTION

1. This lawsuit challenges Comscore's vast data surveillance of California residents' internet activities without their knowledge or consent, including the surveillance of sensitive health communications.

2. Comscore is a media measurement, analytics, and data broker company that secretly tracks consumers across the internet through invisible tracking code called "Scorecard Tags." These Scorecard Tags are embedded on thousands of websites. They intercept users' communications in real-time, including their searches, page views, and interactions with sensitive health content.

3. Operating through Comscore, Inc.'s subsidiary Full Circle Studies, Inc. and its ScorecardResearch product, Defendants deploy these Scorecard Tags to collect users' IP addresses, device information, browsing data, and persistent cookie identifiers, including a unique "UID/XID" cookie that follows users across different websites and browsing sessions. This enables Comscore to build detailed digital dossiers on millions of consumers, tracking what articles they read, what products they view, and even what sensitive medical conditions they research.

4. Comscore's surreptitious interception of users' communications violates California's wiretapping laws. Its systematic collection of IP addresses and routing information without a court order also violates California's pen register statute. And

its unauthorized access to users' devices to extract personal data violates multiple other privacy protections under California law.

5.    Despite representing on its ScorecardResearch homepage that "no personally identifiable information (PII) is ever transmitted by, or linked to, these [Scorecard T]ags," Comscore's own Privacy Policy acknowledges collection of IP addresses, cookie identifiers, device identifiers, geolocation data, and browsing history, information that is personally identifiable and sensitive.

6.    Plaintiffs bring this action on behalf of millions of Californians whose privacy has been invaded by Comscore's unlawful tracking.  Through this action, Plaintiffs seek damages, restitution, and injunctive relief to stop these violations.

## PARTIES

7.    Plaintiff Jeffrey Lawrence Singer is an individual and citizen of the State of California, residing in Los Angeles, California.

8.    Plaintiff Tina Archer Santucci is an individual and citizen of the State of California, residing in Oxnard, California.

9.    Defendant Comscore, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Reston, Virginia. Comscore is a publicly traded company generating more than $350 million in annual revenue.

10.    Defendant Full Circle Studios, Inc. is a corporation organized and existing under the laws of Delaware. Full Circle Studios, Inc. is a wholly owned subsidiary of Comscore, Inc. and shares the same corporate address as Comscore in Reston, Virginia.  Comscore, Inc. has complete dominion and control over Full Circle Studios, Inc., its assets, and its activities.

11.    Comscore, Inc. and Full Circle Studios, Inc. jointly operate the ScorecardResearch brand and service, a global online research platform that functions as a Comscore product and service, and jointly provide the Scorecard Tag tracking

technology through that platform. Plaintiffs allege each Defendant jointly and/or individually infringes privacy rights as explained below.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed class of plaintiffs is a citizen of a state different from the Defendants.

13.     Defendants are subject to specific personal jurisdiction in California, including in this District, because Defendants purposefully directed their data-collection and monetization activities toward California residents. These contacts with California are deliberate, not incidental. As demonstrated herein, Comscore actively processes users' IP addresses to derive California-specific location data, including city, state, and inferred geographic coordinates. Comscore records this California location alongside users' browsing activity and persistent identifiers, and uses it to enhance the commercial value of its media measurement and advertising services. Each such identification of a California user constitutes a purposeful contact with California.

14.     Comscore derives direct financial benefit from identifying California users. Advertisers and media companies pay premium prices for audience insights in specific geographic markets, and California (the nation's most populous state) is among the most valuable. When Comscore identifies a user as a California resident and includes that designation in its analytics and measurement products, it monetizes that California-specific information. Comscore's California contacts thus generate revenue, not merely incidental data.

15.     Full Circle Studies, Inc. functions as the agent, alter ego, and/or mere instrumentality of Comscore, Inc. for purposes of conducting data collection activities through ScorecardResearch. Full Circle Studies, Inc. does not operate an independent

business but rather exists to provide tracking and data collection services as part of Comscore's market research division. Comscore, Inc. controls the development, operation, and monetization of the Scorecard Tag technology, while using Full Circle Studies, Inc. as its operational arm to deploy tracking infrastructure and process user data.

16.    Comscore, Inc. and Full Circle Studies, Inc. do not maintain the separateness required to treat them as distinct entities for jurisdictional purposes. The two entities share common branding, present themselves to the market as a single enterprise, and operate integrated tracking technology without meaningful distinction between the parent and subsidiary's roles. Comscore's own documentation describes ScorecardResearch as "a service offered by Full Circle Studies, Inc. which is also part of the Comscore internet ratings and research group."[1] Further, revenue generated from tracking California users flows to Comscore, Inc. Under these circumstances, the California contacts of Full Circle Studies, Inc. are properly attributed to Comscore, Inc. and vice versa.

17.    Defendant Comscore, Inc. is voluntarily registered as a data broker with the California Privacy Protection Agency pursuant to California Civil Code § 1798.99.82, further evidencing purposeful availment and ongoing business activity in California. This registration constitutes an express acknowledgment that Comscore collects personal information about California consumers with whom it does not have a direct relationship, and represents a deliberate decision to avail itself of the privilege of conducting data brokerage activities directed at California residents. By registering, Comscore submitted itself to California's regulatory jurisdiction and accepted ongoing obligations under California law, including the requirement to maintain its registration annually and to permit California consumers to submit

---

[1] Comscore, Privacy Policy, https://www.comscore.com/About/Privacy-Policy (Accessed January 27, 2026).

**CLASS ACTION COMPLAINT**

1   deletion requests.

2       18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)

3   because a substantial part of the events or omissions giving rise to the claims,

4   including those relating to Plaintiffs Singer and Santucci, occurred in this District.

5   **COMMON FACTUAL ALLEGATIONS**

6   **A. Comscore's Business Model**

7       19.    Comscore operates within the global media measurement and

8   marketing research industry, which provides advertisers, publishers, and agencies

9   with data to understand audiences, plan media strategies, and measure campaign

10  effectiveness across TV, digital, mobile, and streaming. Because consumer attention

11  is fragmented across devices and channels, these services translate viewing and

12  browsing behavior into metrics that guide how advertising budgets are allocated.

13      20.    The demand for these metrics has created a large commercial market:

14  in 2023, the global market research industry generated approximately $54 billion in

15  revenue, with the U.S. sector accounting for around $36.6 billion. Comscore

16  markets and sells its products into this ecosystem, and the scale of its revenue

17  depends on collecting enough user-level data to produce the cross-platform metrics

18  its clients demand.

19      21.    In this industry, Comscore sells media measurement, analytics, and

20  research services that purport to help clients maximize return on investment from

21  advertising by aggregating and analyzing large-scale viewing and engagement data,

22  such as audience composition, media consumption trends, and advertising

23  effectiveness.

24      22.    Comscore's core specialty is cross-platform measurement, meaning the

25  ability to track and analyze how consumers engage with content across multiple

26  devices and channels, including desktop computers, mobile phones, tablets,

27  connected televisions, and streaming services. A single consumer might read a

28

health article on their phone in the morning, research medications on their laptop at work, later visit hospital websites on their personal tablet at a coffee shop, and then watch related video content on their smart TV in the evening. Comscore's business is built on tracking these consumers across all of these touchpoints and stitching together a unified picture of their behavior.

23.    To achieve this cross-platform tracking, Comscore employs a methodology it calls Unified Digital Measurement (UDM 2.0), which combines two complementary data sources. The first source is called "panel data." Comscore recruits and maintains a panel of more than a million consumers who have agreed to have their online behavior tracked in exchange for incentives. These panelists install Comscore software on their devices, allowing Comscore to monitor their browsing activity and collect demographic information such as age, gender, income, and location. Panel data provides Comscore with a "ground truth" sample that it uses to calibrate and validate its broader tracking efforts. Comscore's collection and use of this data is not the direct subject of this complaint.

24.    Comscore's second data source is "census" data. Comscore collects this data at massive scale through tracking code, including the Scorecard Tags at issue in this case, embedded on thousands of websites. Unlike panel data, which comes from a recruited sample, census data captures information from virtually all visitors to tagged websites, regardless of whether they have any relationship with Comscore. This provides Comscore with enormous scale but limited demographic detail compared to its panel data.

25.    By combining panel data with census data, Comscore can extrapolate demographic and behavioral insights from its recruited panel to the millions of anonymous users it tracks through web tags. For example, if Comscore observes through its panel that users who visit certain health websites tend to be women aged 35-54, it can apply that demographic profile to the anonymous visitors it tracks on

similar websites through its Scorecard Tags.

26.     Central to Comscore's tracking infrastructure for its census data is its web impression tags. These are small JavaScript snippets that website operators (known as "publishers" in the advertising industry) embed on their pages. A publisher is any website, application, or digital platform that produces and distributes content to consumers; examples include news websites, health information portals like WebMD and Drugs.com, streaming services, and blogs. Publishers agree to install Comscore's tags in exchange for access to audience measurement data about their own websites.

27.     When a user visits a webpage containing a Comscore tag, the tag activates and captures detailed information about the visit, including page URLs, referrers, browser type, device information, IP address, viewing duration, and engagement metrics. The tag also reads or sets persistent cookie identifiers. Persistent cookie identifiers remain attached to consumers' browsers and allow Comscore to recognize the same user across different websites and browsing sessions.

28.     By aggregating and enriching this behavioral data, Comscore is able to deliver a holistic view of audience activity to all of its customers across platforms and devices. This goes far beyond simply counting page views: Comscore's measurement tools enable audience segmentation, demographic profiling, cross-site and cross-device reach analysis, and detailed competitive benchmarking. These capabilities are valuable to advertisers seeking to understand and target specific consumer segments across many distinct websites, and to publishers seeking to demonstrate the value of their audiences. At the same time, these insights rely on extensive user tracking without consent, which, while powerful for marketers, comes at the expense of individual users' privacy.

//

**CLASS ACTION COMPLAINT**

**B. Comscore's Collection of User Data Through Scorecard Tags**

29.    As part of its census data collection, Comscore uses persistent cookies and tracking pixels it calls "Scorecard Tags." The Scorecard Tag is the foundation for Comscore's tracking, profiling, and user identification capabilities across sites and over time.  These capabilities are key to analyzing and improving Comscore's clients' marketing efforts and thus key to Comscore's revenue generation.

30.    A Scorecard Tag is a piece of computer code that website owners embed on their webpages. Despite being called a "tag," it is not actually a visible element but rather invisible JavaScript code that executes when a webpage loads. When a user's browser loads a page containing a Scorecard Tag, the browser is forced to communicate with servers controlled by Comscore, including domains such as "sb.scorecardresearch.com."

31.    During this forced communication, the Scorecard Tag extracts and transmits to Comscore information about the user and their browsing activity that was intended only for the website the user is visiting. This includes both information that the browser would normally send only to the visited website and additional data that the tag's JavaScript code extracts from the user's device and browsing session. These transmissions occur in real time, contemporaneously with users' interactions with websites; i.e., as the webpages load and as users submit searches, click links, or navigate pages. The Scorecard Tag triggers and sends these communications to Comscore while users' communications with the websites are in transit, not after-the-fact.

32.    The core identifier used by Comscore is the UID/XID cookie, which is a random unique identifier used to recognize browsers across sites and over time, refreshed whenever a Scorecard Tag is loaded. A cookie is a small text file that a web server instructs a browser to store on the user's device. Once stored, the cookie is automatically included in future communications with that server, allowing the

server to recognize returning visitors. The Scorecard Tag uses the UID/XID cookie to track users over time and across different websites. As Comscore's own documentation states, the "ScorecardResearch Tags send a message to the ScorecardResearch service that causes a ScorecardResearch cookie to be set or an online identifier to be collected along with information related to the usage of the services provided by the Publisher."[2]

33.    When a user visits any website containing the Scorecard Tag, the tag reads this UID/XID cookie and transmits it to Comscore along with information about the user's current activity. This allows Comscore to connect the user's activity across different websites and over time, building an increasingly detailed profile of their interests, behaviors, and characteristics.

**C. Data Collected Through the Scorecard Tag**

34.    Comscore's Privacy Policy identifies its collection of web users' personal information through the Scorecard Tag. Comscore admits that it collects the following: (1) Cookie identifiers (i.e., unique cookie IDs associated with the user's browser such as the UID/XID cookie); (2) IP addresses; (3) Device identifiers (e.g., device make, model and OS, browser and data connection type); (4) Geolocation inferred from the IP address; and (5) Internet or other electronic network activity including information about the users' browsing history, "content that users view on the websites," website preferences, and users' uses of websites or applications (e.g., time accessed, duration of visit, etc.).[3]

35.    In addition, Comscore admits that it collects Sensitive Personal Information as defined under U.S. state privacy laws. Specifically, this includes:

---

[2] ScorecardResearch, Privacy Policy (last updated October 28, 2025), https://www.scorecardresearch.com/privacy.aspx (Accessed January 26, 2026).
[3] *Id.;* see also the similar disclosures in Comscore's Privacy Policy (last updated June 30, 2025), http://comscore.com/About/Privacy-Policy (Accessed January 26, 2026), which directly links to the Scorecard Research Privacy Policy.

"Personal information revealing racial or ethnic origin, religious or philosophical beliefs, union membership, a mental or physical condition or diagnosis, sex life or sexual orientation, or citizenship or citizenship status."[4]

36.     The IP address which the Scorecard Tag collects is a globally unique numerical identifier that guides or routes communications across the internet. Often written as four sets of numbers separated by periods (e.g., 192.555.455.145), Internet Service Providers assign IP addresses to networking devices such as modems or routers. IP addresses function as the essential addressing system of the internet. Just as a telephone number is a unique number necessary to route a phone call to the correct household, an IP address is a unique number necessary for routing internet communications to the correct location.

37.     The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking purposes. IP addresses can allow companies to target advertisements to users in specific geographic areas with over 95% accuracy. For example, businesses who are trying to reach specific demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide wireless internet networks or associated with particular events, such as job fairs or festivals. By using IP addresses to target specific households, businesses, or events based on their location, Comscore can segment audiences by geography and provide location-based insights to its clients, helping advertisers avoid wasting money on ads unlikely to be relevant to their target audience and thus boosting the value of Comscore's services.

38.     IP addresses are not openly accessible or discoverable at large. If a user is not actively transmitting data to a particular website or server, their IP address remains private and is not exposed to the broader internet or third parties. However,

---

[4] ScorecardResearch, Privacy Policy (last updated October 28, 2025), https://www.scorecardresearch.com/privacy.aspx (Accessed January 26, 2026).

**CLASS ACTION COMPLAINT**

the broader term "IP address" used in this complaint should be distinguished from the term "private IP address," which refers to a different, specific type of IP address used within internal networks, which is not routable on the public internet and does not reveal anything about a user's geolocation. Private IP addresses are not relevant to or otherwise addressed in this complaint.

39.    An IP address is "routing, addressing, or signaling information." It is "routing" or "signaling" information because it sends or directs the user's communication from the router in their home or workplace to the website they are communicating with, ensuring that the web content being accessed (whether that be websites, streaming content, emails, or other data) reaches the user correctly. It is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

40.    When combined with cookies such as Comscore's UID/XID cookie, IP addresses can be powerful tools for identifying specific individuals and tracking their browsing habits. A cookie assigns a stable identifier to a particular browser, while an IP address identifies the network connection used at that moment. When the same cookie identifier reappears from different IP addresses over the course of a day or week (for example, a residential IP in the morning and evening, an employer's IP during working hours, and a coffee shop's IP address during lunch) the company can associate those networks, and the locations they imply, with the same browser. Over time, that pattern distinguishes that browser from others who share the same network and maps routine usage. Because cookies persist across IP changes (mobile data, travel, dynamic addressing), they bridge sessions and provide continuity, while IP information supplies location and network context. Used together, cookies and IP addresses enable highly granular tracking of a browser's activity across sites and over time.

41.    The Scorecard Tag functions as a pen register, systematically recording

users' IP addresses and routing information from thousands of websites as an undisclosed third party that the users have no knowledge of or relationship with.

42.     This data collection begins the moment a page loads, before users have any opportunity to review privacy policies, to the extent they are applicable, or consent to tracking. The transmission to Comscore's servers occurs automatically in the background, invisible to users.

43.     The Scorecard Tag intercepts communications between users and website operators while these communications are in transit. As data travels between users' browsers and a website's servers, the Scorecard Tag intercepts and reads these transmissions in real-time, capturing clicks, page visits, and search terms as they happen and form entries as they are submitted. Comscore reads or attempts to read these communications by analyzing and interpreting the data streams mid-transmission, automatically identifying and classifying data types and values, extracting personal information, search queries, and behavioral data while the communications are still traveling to their intended destination.

**D. Examples of Comscore's Deployment on Sensitive Websites**

44.     Comscore's Scorecard Tag technology is deployed across numerous websites, including those containing sensitive medical and health information. The following examples demonstrate how this tracking operates without user consent.

45.     **WebMD (webmd.com):** WebMD.com is one of the most visited health information websites in the United States, providing medical news, condition overviews, symptom checkers, and treatment guidance to millions of users every month. The site serves as a major online destination for individuals seeking information about symptoms, diagnoses, and health-related decisions.

46.     When a user visits webmd.com, their personal information is immediately transmitted to Comscore through its embedded Scorecard Tag, which communicates with Comscore-controlled domains (such as

sb.scorecardresearch.com). This transmission includes: (1) the contents of the user's communications with the website, including the URLs visited, search terms entered, and page content viewed; (2) the user's IP address, from which Comscore derives the user's geographic location; and (3) the persistent UID/XID cookie identifier associated with the user's browser, which allows Comscore to recognize the user across different websites and browsing sessions. This data is transmitted immediately, automatically, and invisibly, without the user's consent.

47.    For example, when users search for sensitive medical information on WebMD, such as searching for "vasectomy" or "HIV" on WebMD's "Find a Doctor" page, the Scorecard Tag captures these search terms and the complete URL containing this sensitive query, alongside the user's IP address and UID/XID cookie.

48.    These transmissions link the user's sensitive medical searches to their persistent UID/XID identifier, enabling Comscore to associate these health-related queries with any past or future browsing activity by the same user across thousands of websites.

49.    **Drugs.com:** Drugs.com is a medical website offering in-depth drug information, side effect databases, dosage guides, and drug interaction tools. It also offers other valuable and popular services such as pill identification. The website serves as a health information resource for millions of users across the United States, including those seeking specific guidance related to their prescribed medications and other health matters.

50.    When a user visits drugs.com, their personal information is simultaneously transmitted to Comscore through its embedded Scorecard Tag, which communicates with Comscore-controlled domains (such as sb.scorecardresearch.com). This transmission includes: (1) the contents of the user's communications with the website, including the URLs visited, search terms entered,

and page content viewed; (2) the user's IP address, from which Comscore derives the user's geographic location; and (3) the persistent UID/XID cookie identifier associated with the user's browser, which allows Comscore to recognize the user across different websites and browsing sessions. This data is transmitted immediately, automatically, and invisibly, without the user's consent.

51.    For example, when users utilize the Pill Identifier service by entering pill imprints to identify an unknown medication, the Scorecard Tag captures these entries, the complete URL containing the pill characteristics, and the name of any identified medication the user then clicks on, alongside the user's IP address and UID/XID cookie.

52.    Similarly, when users search for a specific drug, such as Biktarvy® (which treats HIV), the Targeted Scorecared captures the same information.

53.    These transmissions link sensitive information about specific medications a user possesses or is interested in to their persistent UID/XID identifier, enabling Comscore to associate this health-related activity with any past or future browsing activity by the same user across thousands of websites.

**E. Comscore's Monetization of User Data**

54.    Comscore does not collect this data for the benefit of the user. It collects it because, under Comscore's UDM model described above, user-level browsing and engagement data is the raw material for Comscore's commercial products. Comscore monetizes Plaintiffs' and Class Members' data by transforming it into audience measurement, targeting insights, and analytics deliverables that it sells to advertisers, publishers, and agencies for its own financial benefit and for the financial benefit of these third parties. In other words, Comscore compiles user data from disparate websites and transforms it into revenue by charging clients for access to measurement products and datasets derived from that data through subscriptions, licenses, and paid reporting and data services.

55.    Comscore delivers these measurement insights to its clients through interactive dashboards, custom reports, and data feeds. Clients can explore metrics by demographic, device, content, or time, receive secure file transfers in defined schemas, or connect via APIs and respondent-level data feeds to integrate directly into their own systems. Clients pay for this access because it lets them plan and evaluate advertising campaigns, refine targeting, and allocate budgets based on measured audience behavior.  These insights are valuable to advertisers because they inform media buying decisions, campaign targeting, and budget allocation. When Comscore provides audience profiles showing that visitors to health websites tend to have certain demographic characteristics or interests, advertisers use that information to target those users with relevant advertisements across the web. The more granular and linkable the underlying user data, the more valuable Comscore's products are, and the more Comscore can charge for them.

56.    To remove any doubt, Comscore explicitly confirms in its Privacy Policy that it shares user data with its marketing partners (clients) for commercial marketing purposes. Comscore's policy thus confirms that this data collection supports a commercial ecosystem in which Comscore profits from compiling, packaging, and disseminating user-derived information.

**F.  Lack of User Consent**

57.    Throughout these data collection activities, Comscore operates without user consent. The data collection begins immediately when a webpage loads, before users can review any privacy policies or make choices about tracking. Users are never presented with Comscore's Privacy Policy, never agree to Comscore's data collection, and have no opportunity to opt out before their data is transmitted to Comscore's servers. Most users remain entirely unaware that Comscore exists, much less that it maintains detailed profiles about their medical searches, drug queries, and browsing patterns across thousands of websites. Even consent to a

**CLASS ACTION COMPLAINT**

website's own privacy policy does not constitute consent for Comscore's separate commercial data collection—users do not expect that visiting a medical website means agreeing to have their health searches shared with a media measurement company they have never heard of.

### G. Comscore's Registration as a California Data Broker

58.    Comscore's formal registration in California as a data broker, according to the California Privacy Protection Agency, indicates that Comscore actively collects, processes, and shares consumer information for commercial purposes. As a data broker, Comscore aggregates user data from multiple sources, including browsing behavior, device-level data, and third-party partners, and uses that data to support media measurement, marketing research, and behavioral analysis.

### FACTS SPECIFIC TO PLAINTIFFS

59.    During the class period, each Plaintiff visited one or more websites that deployed Comscore's Scorecard Tag tracking technology, including WebMD and Drugs.com. Each Plaintiffs' personal information, including their IP address, device information, browsing activity, and persistent UID/XID cookie identifier, was intercepted and collected by Comscore.

60.    While located at his residence in California, Plaintiff Jeffrey Lawrence Singer visited Drugs.com within the past year using the Chrome browser on his computer. On Drugs.com, Mr. Singer searched for medication reviews and general health information related to a serious medical condition Mr. Singer has been diagnosed with. Mr. Singer does not have an account on this website, has never subscribed to a newsletter on this website, and has not consented to any privacy policy that this website may have published. Mr. Singer did not know that Comscore was collecting his personal information when he visited Drugs.com and never gave Comscore consent to intercept his communications and collect data about him.

61.     While located at her residence in California, Plaintiff Tina Archer Santucci visited WebMD and Drugs.com within the past year using the Chrome browser on her phone. On WebMD.com, Ms. Santucci ran searches for and conducted research relating to a serious injury she sustained and related medication and treatment. Ms. Santucci also used WebMD.com to run searches for and conduct research relating to complications from a medical procedure she underwent. Ms. Santucci used the website Drugs.com to search for and research medication relating to a medical condition she was diagnosed with. Ms. Santucci does not have an account on these websites, has never subscribed to their newsletters, and has not consented to any privacy policy that these websites may have published. Ms. Santucci did not know that Comscore was collecting her personal information when she visited these websites and never gave Comscore consent to intercept her communications and collect data about her. After using these websites, Ms. Santcci has received advertisements on other websites related to her searches and research conducted on the websites.

62.     Comscore identified Plaintiffs and created profiles containing their likes and interests, including based on their activity on WebMD and/or Drugs.com.

63.     Plaintiffs did not know, nor had reason to know, that unknown third-party Comscore surreptitiously collected information about their web activity (including their IP addresses) and created profiles about their likes and interests.

## CLASS ACTION ALLEGATIONS

64.     **Class Definition**: Plaintiffs Jeffrey Lawrence Singer and Tina Archer Santucci bring this proposed class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and a Class of others similarly situated, defined as follows:

> All California residents who visited a website with the Comscore Scorecard Tag embedded, including WebMD.com and Drugs.com, or who otherwise had their personal information collected by Comscore

through its tracking technology, during the applicable limitations period
before and after the filing of the complaint in this matter and through
and including the date of resolution.

Excluded from the Class are: (1) any Judge or Magistrate presiding over
this action and members of their families; (2) Defendants, Defendants'
subsidiaries, parents, successors, predecessors, and any entity in which
Defendants or their parents have a controlling interest and its officers
and directors; (3) persons who properly execute and file a timely
request for exclusion from the Class; (4) persons whose claims in this
matter have been finally adjudicated on the merits or otherwise
released; (5) Plaintiffs' counsel and Defendants' counsel; (6) registered
users of the websites who were presented with and assented to the
websites' Terms of Use and Privacy Policy during the registration
process; and (7) the legal representatives, successors, and assigns of any
such excluded persons.

65.     **Numerosity**: The exact number of members of the Class ("Class
Members") is unknown and not available to Plaintiffs at this time, but it is clear that
individual joinder is impracticable. Discovery will show that Defendants have
surreptitiously collected and analyzed data from hundreds of thousands, if not
millions, of consumers who fall into the definition of the Class. Class Members can
be identified through Defendants' records.

66.     **Commonality and Predominance**: There are many questions of law
and fact common to the claims of Plaintiffs and the putative Class, and those
questions predominate over any questions that may affect individual members of the
Class. Common questions for the Class include, but are not necessarily limited to
the following:

A.     Whether Defendants read, attempted to read, or learned the
content of the communications made by Plaintiffs and the Class;

B.     Whether Defendants' actions were willful;

C.    Whether Defendants had the capability to and/or used Plaintiffs' and the Class Members' communications for their own purposes;

D.    Whether Defendants' software is a pen register;

E.    Whether Defendants accessed Plaintiffs' and the Class Members' computer systems; and

F.    Whether Defendants obtained consent from Plaintiffs and Class Members.

67.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class Members in that Plaintiffs, like all Class Members, have been injured by Defendants' misconduct at issue.

68.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class. That is, Plaintiffs and the Class Members sustained damages as a result of Defendants' conduct. Plaintiffs also have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

69.    **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and

comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

70. Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## FIRST CAUSE OF ACTION
### Violation of Cal. Penal Code § 631
### <u>(On behalf of Plaintiffs and the Class)</u>

71. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

72. To establish liability under CIPA § 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

73.    Defendants' software, including the Scorecard Tag, is a "machine, instrument, contrivance" used to collect communications.

74.    When Plaintiffs and Class Members communicate with websites by visiting a page, entering search terms, or clicking links, these interactions constitute communications containing content and meaning. This includes URLs visited, search terms entered, webpage content accessed, and user interactions, all of which are "contents" of communications under CIPA.

75.    Defendants, through the Scorecard Tag embedded on websites, intercept these communications while they are in transit. Specifically, when users interact with a website, the Scorecard Tag causes their browsers to transmit the contents of those communications to Comscore's servers at sb.scorecardresearch.com and related domains. This interception occurs in real-time as users' communications are being sent to the intended website.

76.    Defendants willfully read, analyze, and learn the contents and meaning of these intercepted communications. Comscore's systems process the communications to extract URLs, search terms, user interactions, and other communication contents, which Defendants use to build detailed user profiles and provide media measurement and advertising services.

77.    Plaintiffs and Class Members did not consent to Defendants intercepting, reading, or using their communications. No notice was provided, and no opportunity to consent was given before the interceptions began.

78.    Defendants use the intercepted communications for their own commercial purposes, including building user profiles, enhancing measurement and analytics services, and generating revenue. This use demonstrates that Defendants are not acting as a mere extension of the websites but as an independent party exploiting intercepted communications.

79.    Defendants' systematic interception and use of Plaintiffs' and Class

Members' communications while in transit violates Cal. Penal Code § 631(a).

80.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages of $5,000 per violation and injunctive relief.

**SECOND CAUSE OF ACTION**
**Violation of Cal. Penal Code § 638.51**
**(On behalf of Plaintiffs and the Class)**

81.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

82.    California law prohibits the installation of a pen register without first obtaining a court order. Cal. Penal Code § 638.51.

83.    The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

84.    Defendants' Scorecard Tag is a "pen register" because it is a device or process that records addressing or signaling information, in this instance, Plaintiffs' and Class Members' IP addresses, the websites they visited, derived location information, device identifiers, and other persistent identifiers, from electronic communications transmitted by their devices. Furthermore, Defendants' software is a device or process that identifies consumers, gathers data, and correlates it, building comprehensive profiles of users and their online activities.

85.    Defendants were not authorized by any court order to use a pen register to track Plaintiffs' and Class Members' IP addresses, location and personal information, nor did they obtain consent from Plaintiffs and the Class to operate such a device.

86.    Defendants' systematic recording of Plaintiffs' and Class Members' IP addresses and other routing, addressing, and signaling information, without a court order or user consent, violates Cal. Penal Code § 638.51.

**CLASS ACTION COMPLAINT**

87.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages of $5,000 per violation and injunctive relief.

## THIRD CAUSE OF ACTION
### Unlawful Recording of and Eavesdropping Upon Confidential Communications
### Violation of Cal. Penal Code § 632
### (On behalf of Plaintiffs and the Class)

88.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

89.    California Penal Code § 632 prohibits using "an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication . . . intentionally and without the consent of all parties to a confidential communication."

90.    Defendants' Scorecard Tag is an electronic amplifying or recording device for purposes of § 632. The Scorecard Tag duplicates and records users' interactions in real-time as they navigate webpages, including recording search queries entered, links clicked, pages viewed, and form inputs submitted. The Scorecard Tag also collects and records information from the browser, such as language settings, browser type, operating system, device information, and IP address.

91.    Section 632 defines a "confidential communication" to include "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."

92.    Plaintiffs' and Class Members' communications with websites deploying the Scorecard Tag were confidential communications for purposes of § 632. These communications included sensitive medical searches on websites such as WebMD and Drugs.com, where users researched health conditions and searched for information about medications in their possession and prescription medicines. Users reasonably expected these communications to remain between themselves and the websites they chose to visit, not to be secretly recorded by an undisclosed third-party

data broker.

93.    Because Defendants did not disclose to Plaintiffs or Class Members that their private communications were being recorded and eavesdropped upon by Comscore, Defendants did not obtain, and could not have obtained, Plaintiffs' or Class Members' express or implied advance consent to Comscore's recording or monitoring of those communications. As a result, Plaintiffs and Class Members had an objectively reasonable expectation that their confidential communications were not being recorded and eavesdropped upon by Comscore.

94.    That expectation and its objective reasonableness arise, in part, from: (i) the objective offensiveness of surreptitiously recording and eavesdropping upon people's private communications, particularly those involving sensitive medical conditions and pharmaceutical research; (ii) the ease with which disclosure or warning could have been provided; and (iii) the absence of any direct relationship between Plaintiffs and Class Members and Comscore that would put them on notice of Comscore's involvement.

95.    Plaintiffs and Class Members expected that their personal and private communications with the websites they visited would not be intercepted and secretly recorded and eavesdropped upon by undisclosed third parties such as Comscore.

96.    By embedding the Scorecard Tag on publisher websites and using that technology to contemporaneously intercept, redirect, and record Plaintiffs' and Class Members' confidential communications, Defendants eavesdropped upon and recorded website users' confidential communications through an electronic amplifying or recording device, in violation of § 632.

97.    At no time did Plaintiffs or Class Members consent to Defendants' unlawful conduct. Nor could Plaintiffs or Class Members reasonably expect that their confidential communications with websites such as WebMD and Drugs.com would be overheard or recorded by Comscore, an entity with whom they have no

relationship and whose existence they were unaware of.

98.    Upon information and belief, Defendants utilized Plaintiffs' and Class Members' sensitive personal information, including their medical searches and pharmaceutical research, for Defendants' own commercial purposes, including building user profiles, enhancing media measurement and analytics services, and generating more than $350 million in annual revenue.

99.    Defendants' intentional eavesdropping upon and recording of Plaintiffs' and Class Members' confidential communications, without their consent, violates Cal. Penal Code § 632.

100.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class seek statutory damages of $5,000 per violation and injunctive relief.

## FOURTH CAUSE OF ACTION
### California Comprehensive Computer Data Access and Fraud Act
### Violation of Cal. Penal Code § 502
### (On behalf of Plaintiffs and the Class)

101.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

102.    The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act ("CDAFA") to "expand the degree of protection afforded to individuals ... from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). In enacting the statute, the Legislature emphasized the need to protect individual privacy: "The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." *Id.*

103.    Plaintiffs' and Class Members' devices are "computers" or "computer systems" within the meaning of § 502(b) because they are devices capable of being used in conjunction with external files and perform functions such as logic, arithmetic, data storage and retrieval, and communication.

104.    Defendants violated the following sections of CDAFA § 502(c):

(a)    "Knowingly accesses and without permission... uses any data, computer, computer system, or computer network in order to ... wrongfully control or obtain money, property, or data." *Id*. § 502(c)(1).

(b)    "Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network." *Id*. § 502(c)(2).

(c)    "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." *Id*. § 502(c)(7).

105.    Defendants knowingly "accessed" Plaintiffs' and the Class Members' computers and/or computer systems because they purposefully gained entry to and/or caused output from their computers to obtain personal information, including browsing data, device identifiers, IP addresses, and tracking cookies.

106.    Plaintiffs and the Class suffered damage and/or loss resulting from Defendants' conduct described herein. Specifically: (1) Defendants' software occupied Plaintiffs' and the Class Members' storage space on their devices without authorization; (2) Defendants' software caused data to be output from Plaintiffs' and the Class Member's devices; (3) Defendants' acts used computer resources of the aforementioned devices; and (4) Defendants were unjustly enriched and profited from the data taken from Plaintiffs and the Class.

107.    Plaintiffs and the Class now seek compensatory damages, injunctive relief, disgorgement of profits, other equitable relief, punitive damages, and attorneys' fees pursuant to § 502(e)(1)–(2).

## FIFTH CAUSE OF ACTION
### Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq.*
### (On behalf of Plaintiffs and the Class)

108. Plaintiffs incorporate the foregoing allegations as if fully set forth herein

109. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

110. The ECPA protects both the sending and the receipt of communications.

111. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

112. The transmission of Plaintiffs' website page visits, search terms, selections, and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

113. The transmission of this information between Plaintiffs and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

114. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

115. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

116. The ECPA defines "electronic, mechanical, or other device," as "any

device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

117.    The following instruments constitute "devices" within the meaning of the ECPA:

- The Comscore tags described above, including Comscore's Scorecard Tag;
- Any other tracking code, SDK, or JavaScript snippets used by Defendant;
- Any cookies, including the UID/XID cookies, used by Defendant;
- The plan Defendant carried out to effectuate the tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to navigate the Website.

118.    Plaintiffs and Class Members' interactions with each website are electronic communications under the ECPA.

119.    By utilizing the Scorecard Tag and other tracking technologies, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class members in violation of 18 U.S.C. § 2511(1)(a).

120.    Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiffs and Class members regarding their sensitive medical and health information. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

121.    By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C.

**CLASS ACTION COMPLAINT**

§ 2511(1)(d).

122.   Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, CDAFA, and other state wiretapping and data privacy laws, among others.

123.   The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, the association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies the crime-tort exception because it violate[s] state law, including CIPA, intrusion upon seclusion, and invasion of privacy.

124.   Defendant was not acting under the color of law to intercept Plaintiffs' and Class members' wire or electronic communications.

125.   Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy. Plaintiffs and Class members had a reasonable expectation that Defendant would not intercept their communications for its own commercial benefit and for the benefit of third-parties without their knowledge or consent.

126.   The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

127.   As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiffs seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2520(c)(2)(B).

### SIXTH CAUSE OF ACTION
**Invasion of Privacy**
**Violation of Art. 1, § 1 of the California Constitution**
**(On Behalf of Plaintiffs and the Class)**

128.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

129.   "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

130.   The right to privacy in California's Constitution creates a right of action against private entities such as Defendants. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

131.   Plaintiffs and Class Members have a legally protected privacy interest in their IP addresses, location data, and other routing information that Comscore captures without notice or consent when they access and view websites implementing Comscore's Scorecard Tag. These privacy interests are recognized by the California Constitution, CDAFA, and CIPA.

132.   Plaintiffs and Class Members had a reasonable expectation of privacy concerning this data when navigating the internet. Comscore is a third-party data broker with whom Plaintiffs and Class Members have no direct relationship. Nevertheless, Comscore through its publisher-websites that deploy its tracking technology collects Plaintiffs' and Class Members' IP addresses, page views, browsing history, search queries, location data, device information, and other routing

information across multiple unrelated websites. Comscore also uses this information to build comprehensive profiles of their online activities.

133.   The identifiable and private information Comscore intercepted, stored, and used without Plaintiffs' and Class Members' consent was used to track them consistently and persistently across multiple websites and to provide targeted measurement and analytics services. The manner in which Comscore intercepted this information deliberately circumvented established privacy-protection mechanisms and violated social norms.

134.   Defendants' conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person because: (i) the information collected by Comscore is personally identifying information protected by the California Constitution and numerous statutes; (ii) Comscore creates comprehensive profiles of users by linking their activities across multiple unrelated websites; (iii) Defendants did not have authorization or consent to collect users' IP addresses and other routing information; and (iv) this invasion deprived Plaintiffs and Class Members of the ability to control the dissemination and use of their personal information, an ability that is a fundamental privacy right.

135.   Reasonable individuals do not expect that there is an entity intercepting and monitoring their personally identifiable online activity across multiple websites, let alone using this information for profit through its cookie syncing and behavioral targeting services.

136.   Defendants' conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiffs. Defendants did not have consent to intercept this information, let alone use and monetize it.

137.   As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members have had their privacy invaded and have sustained injury, including the loss of control over their personal information.

**CLASS ACTION COMPLAINT**

138.   Plaintiffs and Class Members seek appropriate relief for those injuries, including but not limited to restitution, disgorgement of profits earned by Defendants because of, by way of or in connection with the intrusions upon Plaintiffs' and Class Members' privacy, nominal damages, and all other equitable relief that will compensate Plaintiffs and Class Members properly for the harm to their privacy interests.

139.   Plaintiffs also seek such other relief as the Court may deem just and proper.

### SEVENTH CAUSE OF ACTION
### Violation of the Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (On Behalf of Plaintiffs and the Class)

140.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

141.   California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

142.   Defendants engaged in unlawful business practices in connection with their unauthorized collection of Plaintiffs' and Class Members' private information, in violation of the UCL.

143.   The acts, omissions, and conduct of Defendants as alleged herein constitute "business practices" within the meaning of the UCL.

144.   Defendants violated the "unlawful" prong of the UCL by violating, *inter alia*, Plaintiffs and Class Members' constitutional rights to privacy, state privacy statutes, and state consumer protection statutes.

145.   Defendants' acts, omissions, and conduct also violate the "unfair" prong of the UCL because those acts, omissions, and conduct, as alleged therein, offended public policy (including state privacy statutes and state consumer protection statutes) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused

1  substantial injury, including to Plaintiffs and Class Members.

2      146.   The harm caused by Defendants' conduct outweighs any potential

3  benefits attributable to such conduct, and there were reasonably available alternatives

4  to further Defendants' legitimate business interests other than Defendants' conduct

5  described herein.

6      147.   As a result of Defendants' violations of the UCL, Plaintiffs and Class

7  Members have suffered injury in fact and lost money or property, including but not

8  limited to valuable consideration, e.g., access to and control of their private and

9  personal data. Plaintiffs' and Class Members' personal data, including web browsing

10  and device data and personally identifying and addressing information, has monetary

11  value. Defendants deprived Plaintiffs and Class Members of that valuable data

12  without providing just compensation.  Plaintiffs and Class Members would not have

13  used certain websites had they known Defendants were disclosing their personally

14  identifying and addressing information to third parties through those sites.

15      148.   UCL § 17203 provides that the Court may restore to any person in

16  interest any money or property which may have been acquired by means of unfair,

17  deceptive, and fraudulent business acts and practices and may order restitution to

18  Plaintiffs. Plaintiffs and Class Members are entitled under UCL §§ 17203 and 17208

19  to restitution and restoration of all ill-gotten money and property belonging to

20  Plaintiffs and Class Members in Defendants' possession.

21      149.   As a result of Defendants' violations of the UCL, Plaintiffs and Class

22  Members are further entitled to injunctive relief prohibiting Defendants' unlawful and

23  unfair business activities and practices, including an injunction terminating all further

24  distributions of Plaintiffs and Class Members' personal data. This is particularly true

25  since the dissemination of Plaintiffs and Class Members' information is ongoing.

26      150.   Plaintiffs additionally seek any and all other equitable relief that the

27  Court deems just and proper.

28

**CLASS ACTION COMPLAINT**

# EIGHTH CAUSE OF ACTION
## Common Law Invasion of Privacy – Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Class)

151.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

152.   To state a claim for intrusion upon seclusion, Plaintiffs must establish that: (1) the defendant intruded on a place, conversation, or matter in which Plaintiffs had a reasonable expectation of privacy; and (2) the intrusion would be highly offensive to a reasonable person.

153.   Defendants' collection, interception, and use of Plaintiffs' and Class Members' personally identifiable information, including IP addresses, browsing history, page views, search terms, location information, and device identifiers constitute an intentional intrusion. Comscore's use of this information to create detailed profiles of individuals through its tracking technology, which tracks and profiles Plaintiffs and Class Members across multiple unrelated websites, likewise constitutes an intentional intrusion.

154.   Plaintiffs and Class Members reasonably expected that their IP addresses, location data, and other personal information would not be intercepted, collected, and used by Comscore, a third-party data broker with whom they have no direct relationship.

155.   This expectation is particularly reasonable given that Comscore operates entirely behind the scenes, with no visible interface for users, no direct services provided to users, and no opportunity for users to review or consent to Comscore's privacy practices.

156.   The information Comscore collects is especially sensitive because it includes IP addresses (which reveal users' geographic locations) and is used to create comprehensive profiles tracking users' activities across multiple unrelated websites.

157.   Plaintiffs and Class Members did not consent to, authorize, or

understand Comscore's interception or use of their private data.

158.   Defendants' conduct is highly offensive to a reasonable person because: (a) it violates established social norms and expectations regarding online privacy; (b) it occurs without users' knowledge or consent and provides no opportunity for users to opt out; (c) it creates comprehensive profiles of users' online activities across multiple unrelated websites and across devices; and (d) it monetizes users' personal information for Defendants' commercial gain without their knowledge or compensation.

159.   Defendants' conduct caused Plaintiffs and Class Members harm, including a violation of their privacy interests, loss of control over their personal information, and emotional distress from the knowledge that their online activities have been secretly monitored and profiled.

160.   Plaintiffs and Class Members seek damages to compensate for the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Defendants as a result of their intrusion upon seclusion.

161.   Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

162.   Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Jeffrey Lawrence Singer and Tina Archer Santucci individually and on behalf of the Class, pray for the following relief:

(a)     An order certifying the Class as defined above, appointing Jeffrey Lawrence Singer and Tina Archer Santucci as the representatives

of the Class, and appointing their counsel as Class Counsel;

    (b)    An order declaring that Defendants' actions, as set out above, violate Cal. Pen. Code § 631, Cal. Pen. Code § 638.51, Cal. Pen. Code § 632, Cal. Pen. Code § 502, Art. 1, § 1 of the California Constitution, Cal. Bus. & Prof. Code § 17200, 18 U.S.C. § 2511(1), *et seq.*, and constitute a common law invasion of privacy.

    (c)    An injunction requiring Defendants to cease all unlawful activities;

    (d)    An award of statutory damages, disgorgement of profits, punitive damages, costs, attorneys' fees, and any other monetary relief available;

    (e)    Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: February 3, 2026        Respectfully submitted,

        By: */s/ James C. Shah*
        James C. Shah (SBN #260435)
        Email: jcshah@millershah.com
        Kolin C. Tang (SBN #279834)
        Email: kctang@millershah.com
        **MILLER SHAH LLP**
        8730 Wilshire Blvd., Suite 400
        Los Angeles, CA 90211
        Telephone: (866) 540-5505
        Facsimile: (866) 300-7367

Jonathan M. Jagher (*pro hac vice* forthcoming)
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6486
jjagher@fklmlaw.com

Nicholas R. Lange (*pro hac vice* forthcoming)
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
nlange@fklmlaw.com

*Counsel for Plaintiffs and the Proposed Class*