VENABLE LLP
Jean-Paul P. Cart (SBN 267516)
jpcart@venable.com
Harry Libarle (SBN 346020)
hlibarle@venable.com
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone: 415.653.3750
Facsimile: 415.653.3755

*Attorneys for Defendants,*
*Comscore, Inc. and Full Circle Studies, Inc.*

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JEFFREY LAWRENCE SINGER and TINA ARCHER SANTUCCI, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

COMSCORE, INC., a Delaware corporation, and FULL CIRCLE STUDIES, INC., a Delaware corporation,

Defendants.

Case No. 2:26−cv−01108−SVW−JDE

Hon. Stephen V. Wilson

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT**

Date: June 22, 2026
Time: 1:30 p.m.
Dept.: Courtroom 10A, 10th Floor

Filed Concurrently with:
1. Declaration of Jean-Paul P. Cart
2. Request for Judicial Notice
3. [Proposed] Order

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on June 22, 2026, at 1:30 p.m., or as soon thereafter as this matter may be heard, in the courtroom of the Honorable Stephen V. Wilson, located in Courtroom 10A, 10th Floor, of the United States District Courthouse, 350 W 1st Street, Los Angeles, CA 90012, Defendants Comscore, Inc. and Full Circle Studies, Inc. (collectively, "Defendants") will and hereby do move this Court to dismiss Plaintiffs Jeffrey Lawrence Singer's and Tina Archer Santucci's (collectively, "Plaintiffs") Complaint in its entirety, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted. The basis for the requested relief regarding Rule 12(b)(1) is that Plaintiffs' allegations, even if taken as true, fail to adequately satisfy the injury in fact requirement imposed by Article III of the United States Constitution. The basis for the requested relief regarding Rule 12(b)(6) is that Plaintiffs' allegations, even if taken as true, fail to adequately plead the asserted claims as a matter of law.

This Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, the Declaration of Jean-Paul P. Cart (and all exhibits thereto), the Request for Judicial Notice filed concurrently herewith, the pleadings and other documents on file in this case, and all other arguments, evidence, and submissions as may be presented at oral argument of counsel.

Dated: April 17, 2026

VENABLE LLP

By: /s/ Jean-Paul P. Cart
Jean-Paul P. Cart

*Attorneys for Defendants, Comscore, Inc. and Full Circle Studies, Inc.*

## STATEMENT OF COMPLIANCE WITH LOCAL RULE 7-3

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which occurred via Zoom conference on April 10, 2026. *See* Declaration of Jean-Paul P. Cart at ¶ 9. Despite these meet and confer efforts, Defendants and Plaintiffs were not able to agree on the issues raised in this Motion. Accordingly, Court intervention is required.

Dated: April 17, 2026

VENABLE LLP

By: /s/ Jean-Paul P. Cart
Jean-Paul P. Cart

*Attorneys for Defendants, Comscore, Inc. and Full Circle Studies, Inc.*

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

# TABLE OF CONTENTS


| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | STATEMENT OF THE CASE. | | 2 |
| | A. | Allegations Regarding Defendants' Business and Technology. | 2 |
| | B. | Allegations Regarding Plaintiffs' Involvement with Defendants | 5 |
| | C. | Privacy and Cookies Disclosures Made by the Websites on Which Plaintiffs' Claims are Premised. | 6 |
| | D. | Plaintiffs' Claims and Demands for Relief. | 7 |
| III. | PLAINTIFFS LACK ARTICLE III STANDING. | | 10 |
| IV. | PLAINTIFFS HAVE FAILED TO PLEAD THEIR CLAIMS. | | 13 |
| | A. | Plaintiffs' Cal. Pen Code § 631 Claim Fails as a Matter of Law. | 14 |
| | B. | Plaintiffs' Cal. Pen Code § 638.51 Claim Fails as a Matter of Law. | 16 |
| | C. | Plaintiffs' Cal. Pen Code § 632 Claim Fails as a Matter of Law. | 18 |
| | D. | Plaintiffs' CDAFA Claim Fails as a Matter of Law. | 19 |
| | E. | Plaintiffs' ECPA Claim Fails as a Matter of Law. | 21 |
| | F. | Plaintiffs' Common Law Claims Fail as a Matter of Law | 22 |
| | G. | Plaintiffs' UCL Claim Fails as a Matter of Law | 23 |
| V. | CONCLUSION. | | 25 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) .......... 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 14

*Bass v. Facebook, Inc.*,
394 F. Supp. 3d 1024 (N.D. Cal. 2019) .......... 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 13

*Belluomini v. Citigroup, Inc.*,
2013 U.S. Dist. LEXIS 103882 (N.D. Cal. July 23, 2013) .......... 22

*Boulton v. Cmty.Com, Inc.*,
2025 U.S. App. LEXIS 1819 (9th Cir. Jan. 28, 2025) .......... 18

*Briskin v. Shopify Inc.*,
2026 U.S. Dist. LEXIS 11317 (N.D. Cal. Jan. 21, 2026) .......... 22

*Carolus v. Nexstar Media Inc.*,
2025 U.S. Dist. LEXIS 92707 (N.D. Cal. Apr. 9, 2025) .......... 11

*Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*,
956 F.3d 589 (9th Cir. 2020) .......... 22

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) .......... 20, 21

*Eidmann v. Walgreen Co.*,
522 F. Supp. 3d 634 (N.D. Cal. 2021) .......... 25

*Esparza v. Kohl's Inc.*,
723 F. Supp. 3d 934 (S.D. Cal. 2024) .......... 23

*Fayer v. Vaughn*,
649 F.3d 1061 (9th Cir. 2011) .......... 14

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (Cal. 2002) ........ 18

*Gabrielli v. Insider, Inc.*,
2025 U.S. Dist. LEXIS 28788 (S.D.N.Y. Feb. 18, 2025) ........ 11, 12

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ........ 14

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ........ 17, 24

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) ........ 25

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ........ 22

*Harrill v. Emanuel Med. Ctr.*,
2025 U.S. Dist. LEXIS 109125 (E.D. Cal. June 9, 2025) ........ 15

*Heeger v. Facebook*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) ........ 11, 23

*Heiting v. Taro Pharms. USA, Inc.*,
709 F. Supp. 3d 1007 (C.D. Cal. 2023) ........ 20

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ........ 22

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) ........ 22

*Hubbard v. Google LLC*,
2024 U.S. Dist. LEXIS 117876 (N.D. Cal. July 1, 2024) ........ 18, 23

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022) ........ 12

*Ingels v. Westwood One Broad. Servs., Inc.*,
129 Cal. App. 4th 1050 (2005) ........ 25

*Ji v. Naver Corp.*,
2022 U.S. Dist. LEXIS 179263 (N.D. Cal. Sept. 30, 2022) ........ 12, 24

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011) ........ 24

*Licea v. Hickory Farms LLC*,
2024 Cal. Super. LEXIS 66498 (L.A. Super. Ct. Mar. 13, 2024) ........ 17

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ........ 22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 10

*Maghoney v. Dotdash Meredith, Inc.*,
2026 U.S. Dist. LEXIS 36704 (S.D. Cal. Feb. 23, 2026) ........ 11

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ........ 14

*Mastel v. Miniclip SA*,
549 F. Supp. 3d 1129 (E.D. Cal. 2021) ........ 14

*Matera v. Google Inc.*,
2016 U.S. Dist. LEXIS 107918 (N.D. Cal. Aug. 12, 2016) ........ 15

*McGinnis v. community.com, Inc.*,
2023 U.S. Dist. LEXIS 172304 (C.D. Cal. Sept. 25, 2023) ........ 18

*Mikulsky v. Noom, Inc.*,
682 F. Supp. 855 (S.D. Cal. 2023) ........ 11

*Miller v. Hearst Communications, Inc.*,
2012 U.S. Dist. LEXIS 109121 (C.D. Cal. Aug. 3, 2012) ........ 16, 17

*Mitchener v. Talkspace Network LLC*,
2025 U.S. Dist. LEXIS 127525 (C.D. Cal. June 27, 2025) ........ 11, 20

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ........ 10, 11

*Revitch v. New Moosejaw, LLC*,
2019 U.S. Dist. LEXIS 186955 (N.D. Cal. Oct. 23, 2019) ........ 11, 18

*Rodriguez v. Brushfire Recs.*,
2025 U.S. Dist. LEXIS 264091 (C.D. Cal. Dec. 15, 2025) ........ 11

*Rodriguez v. Google LLC*,
2021 U.S. Dist. LEXIS 98074 (N.D. Cal. May 21, 2021) .................................24

*Rodriquez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025).............................................................11

*Saedi v. SPD Swiss Precision Diagnostics GmbH*,
2025 U.S. Dist. LEXIS 83660 (C.D. Cal. Feb. 27, 2025).................................22

*Saeedy v. Microsoft Corp.*,
2023 U.S. Dist. LEXIS 227915 (W.D. Wa. Dec. 21, 2023) ..............................12

*Sanchez v. Cars.com*,
2025 Cal. Super. LEXIS 710 (L.A. Super. Ct. Jan. 27, 2025) ...........................18

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ............................................................19

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) .......................................................................23

*Smith v. Maryland*,
442 U.S. 735 (1979) .......................................................................................17

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......................................................................................10

*Sussman v. Am. Broad. Co.*,
186 F.3d 1200 (9th Cir. 1999).........................................................................21

*Swarts v. Home Depot, Inc.*,
689 F. Supp. 3d 732 (N.D. Cal. 2023) ............................................................24

*Tavernetti v. Superior Court of San Diego Cty.*,
22 Cal. 3d 187 (1978).....................................................................................14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......................................................................................10

*Tsering v. Meta Platforms, Inc.*,
2026 U.S. Dist. LEXIS 5762 (N.D. Cal. Jan. 12, 2026) .............................20, 22

*United States v. Christie*,
624 F.3d 558 (3d Cir. 2010) ...........................................................................17

*Weisbuch v. Cnty of L.A.*,
119 F.3d 778 (9th Cir. 1997) .......... 14

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .......... 15

**Constitutions**

California Constitution .......... 9, 22

**Statutes**

18 U.S.C. § 2511(1) .......... 21

18 U.S.C. § 2511(2) .......... 21

18 U.S.C. § 2520 .......... 21

18 U.S.C.§ 2510 .......... 21

18 U.S.C.§ 2511 .......... 21

Cal. Bus. & Prof. Code § 17200. .......... 2, 9, 23, 24, 25

Cal. Bus. & Prof. Code § 17204 .......... 24

Cal. Pen. Code § 502(c) .......... 19

Cal. Pen. Code § 502(e) .......... 19

Cal. Pen. Code § 631 .......... 14, 15

Cal. Pen. Code § 631(a) .......... 7, 14, 15, 16

Cal. Pen. Code § 632 .......... 8, 18, 19

Cal. Pen. Code § 632(a) .......... 18

Cal. Pen. Code § 632(c) .......... 18

Cal. Pen. Code § 637.2(a) .......... 16

Cal. Pen. Code § 638.50(b) .......... 16

Cal. Pen. Code § 638.51 .......... 7, 16, 17

California Comprehensive Data Access and Fraud Act .......... 2, 8, 9, 19, 20

California Invasion of Privacy Act .......... 2, 7, 8, 9, 16, 18, 21

Electronic Communications Privacy Act .......... 2, 9, 21

**Court Rules**

Federal Rule of Civil Procedure 12(b)(1) .......... 10

Federal Rule of Civil Procedure 12(b)(6) .......... 13, 14

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION.

Plaintiffs Jeffrey Lawrence Singer and Tina Archer Santucci ("Plaintiffs") contend that Defendants Comscore, Inc. and Full Circle Studies, Inc. ("Defendants") obtained anonymous information related to their internet browsing activities because the owners of two websites they visited configured those sites to load Defendants' Scorecard Tag, which transmitted anonymous information about Plaintiffs' use of those websites to Defendants. Plaintiffs could have configured their web browsers not to permit cookies, pixels, or other technologies similar to those at issue here, among other simple options to increase privacy, but apparently did not. They also could have reviewed the privacy and cookie policies of the websites they visited, but apparently did not do that either. What, then, distinguishes the conduct on which Plaintiffs' Class Action Complaint (the "Complaint") is based from standard and entirely expected commercial activities regarding internet use? Nothing. The general fact pattern alleged in the Complaint is ubiquitous—that is how the internet works and information regarding Plaintiffs' browsing activities has surely been collected and shared numerous times per day, every day, since they filed the Complaint. Not only does this reflect that Plaintiffs' claims are without merit, but, as courts have been clear in finding, it shows that Plaintiffs have not been harmed in any way by Defendants' alleged conduct.

Plaintiffs seek to represent a class of all "California residents who visited a website with the Comscore Scorecard Tag embedded, including WebMD.com and Drugs.com, or who otherwise had their personal information collected by Comscore through its tracking technology []." Based on the same general allegations (*i.e.*, that they visited websites that had implemented Defendants' code, that this code provided non-personally-identifiable information to Defendants about Plaintiffs' browsing activities, and that Defendants used this anonymous information to prepare and sell media metrics and similar informational products)

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

Plaintiffs assert eight causes of action for violation of three provisions of the California Invasion of Privacy Act ("CIPA"), violation of the California Comprehensive Data Access and Fraud Act ("CDAFA"), violation of the Electronic Communications Privacy Act ("ECPA"), invasion of privacy, intrusion on seclusion, and violation of Cal. Bus. and Prof. Code § 17200, *et seq*. ("UCL").

All of Plaintiffs' claims fail as a matter of law because they have failed to meet their burden of establishing injury in fact sufficient to provide Article III standing. As CIPA and the UCL both require statutory standing based on a concrete injury, these claims fail for this reason as well—with the CIPA claims deficient for a variety of other reasons. Likewise, Plaintiffs' common law privacy claims fail as a matter of law because they had no reasonable expectations of privacy and because Defendants' alleged conduct was not highly offensive. Plaintiffs' CDAFA and ECPA claims also fail for several reasons, including for failure to allege intent by Defendants and the consent of the non-party website owners that Plaintiffs admit knowingly and intentionally implemented Defendants' technology. Accordingly, and for the reasons explained herein, the Complaint and each claim asserted therein should be dismissed.

## II. STATEMENT OF THE CASE.

### A. Allegations Regarding Defendants' Business and Technology.

Defendants contend that Plaintiffs have failed to accurately describe Defendants' business practices and technologies and that the Complaint contains a range of misleading and contradictory factual allegations. Nevertheless, for purposes of this motion to dismiss, Plaintiffs' core allegation is that Defendants collect data regarding certain consumers without their consent and use that data to sell media measurement and analytics services. Plaintiffs allege that Defendants collect this data in two distinct ways, only one of which they take issue with.

Plaintiffs allege that Defendants collect "panel data" from a panel of "more than a million consumers who have agreed to have their online behavior tracked in

exchange for incentives." (Complaint at ¶ 23.) Neither Plaintiff alleges that they are one of these panelists. (*Id.*) Plaintiffs expressly state that collection and use of panel data "is not the direct subject" of the Complaint. (*Id.*)

Plaintiffs also allege that Defendants collect "census data" from pieces of JavaScript code called "Scorecard Tags" that are embedded in "thousands of websites." (Complaint at ¶ 2.) The websites on which these tags are allegedly embedded are not owned, operated, or controlled by Defendants. Rather, Plaintiffs allege that non-party website operators—referred to in the Complaint and herein as "publishers"—embed the Scorecard Tag into their own websites. Plaintiffs allege that these tags, placed by publishers on websites that Defendants have no control over, provide Defendants with data regarding consumers' visits to and interactions with such websites (*Id*. at ¶¶ 2, 24.)

Plaintiffs contend that Defendants collect census data through tags placed by publishers on an "enormous scale," but admit that it has "limited demographic detail compared to [Defendants'] panel data." (Complaint at ¶ 24.) Plaintiffs allege that Defendants use panel data to inform their interpretation of census data: "[f]or example, if [Defendants] observe[] through [their] panel that users who visit certain health websites tend to be women aged 35-54, [they] can apply that demographic profile to the **anonymous** visitors" they collect data from using Scorecard Tags on similar websites. (*Id.* at ¶ 25) (emphasis added).

Plaintiffs allege that: "[w]hen a user's browser loads a page containing a Scorecard Tag, their browser is forced to communicate with servers controlled by Comscore, including domains such as 'sb.scorecardresearch.com.'" (Complaint at ¶ 30.) Through this process, Plaintiffs contend that the Scorecard Tag sends Defendants "detailed information" about an anonymous user's visit to a website on which the publisher has embedded the tag, "including page URLs, referrers, browser type, device information, IP address, viewing duration, and engagement metrics." (Complaint at ¶ 27.) They also contend that the tag "reads or sets

persistent cookie identifiers" that "remain attached to consumers' browsers and allow [Defendants] to recognize the same user across different websites and browsing sessions." (*Id.*) Plaintiffs state that "[t]his data collection begins the moment a page loads, before users have any opportunity to review privacy policies, to the extent they are applicable, or consent to tracking." (*Id.* at ¶ 42.) Notably, however, Plaintiffs fail to make any allegations that the Scorecard Tag somehow evades user settings not to accept cookies, publishers' own decisions on obtaining consent or providing notice regarding their use of cookies/tags (*e.g.*, use of a cookies banner), or any other technical measures used by Defendants to circumvent refusals to provide information. While Plaintiffs make the blanket allegation that "[e]ven consent to a website's own privacy policy does not constitute consent for [Defendants'] separate commercial data collection" (*see id.* at ¶ 57), they ignore the obvious possibility—and frequent occurrence—that the publisher's privacy policy discloses its data sharing practices.

The Complaint references only two websites on which the Scorecard Tag was allegedly embedded by the relevant publisher (*i.e.*, WebMD.com and Drugs.com), but makes no allegations regarding the cookie, tag, or pixel configurations used by these publishers, whether they provide notice to consumers of any tracking, data sharing, or cookies/tag/pixel use, or whether their privacy policies disclose activities akin to those alleged here. That is, Plaintiffs do nothing to distinguish the way the Scorecard Tag functions from any other cookie, pixel, or tag commonly used in connection with commercial websites.

Plaintiffs allege that publishers embed Scorecard Tags on their websites "in exchange for access to audience measurement data about **<u>their own</u>** websites." (Complaint at ¶ 26 (emphasis added).) They also allege that "[b]y aggregating and enriching [census data with panel data], [Defendants are] able to deliver a holistic view of audience activity to all of its customers across platforms and devices," and that "[t]hese capabilities are valuable to advertisers seeking to understand and

target specific consumer segments across many distinct websites, and to publishers seeking to demonstrate the value of their audiences." (*Id.* at ¶ 28.) Plaintiffs next claim that Defendants "monetize[] [their] data by transforming it into audience measurement, targeting insights, and analytics deliverables that [they] sell[] to advertisers, publishers, and agencies for [their] own financial benefit and for the financial benefit of these third parties." (*Id.* at ¶ 54.) By paying for "subscriptions, licenses, and paid reporting and data services," Plaintiffs allege, Defendants' clients gain access to "interactive dashboards, custom reports, and data feeds" that allow them to "explore metrics by demographic, device, content, or time, receive secure file transfers in defined schemas, or connect via APIs and respondent-level data feeds to integrate directly into their own systems. Clients pay for this access because it lets them plan and evaluate advertising campaigns, refine targeting, and allocate budgets based on measured audience behavior." (*Id.* at ¶¶ 54-55.)

**B. Allegations Regarding Plaintiffs' Involvement with Defendants.**

Plaintiff Jeffrey Lawrence Singer alleges that he is a resident of Los Angeles. (Complaint at ¶ 7.) Singer alleges that "[w]hile located at his residence in California . . . within the past year using the Chrome browser on his computer," he visited Drugs.com and "searched for medication reviews and general health information related to a serious medical condition [he] has been diagnosed with." (*Id.* at ¶ 60.) Plaintiff Tina Archer Santucci alleges that she is a resident of Oxnard. (Complaint at ¶ 8.) Santucci alleges that "[w]hile located at her residence in California . . . within the past year using the Chrome browser on her phone," she: (1) visited WebMD.com and "ran searches for and conducted research relating to a serious injury she sustained and related medication and treatment" and "complications from a medical procedure she underwent'; and (2) "used the website Drugs.com to search for and research medication relating to a medical condition she was diagnosed with." (*Id.* at ¶ 61.) Santucci alleges that she has since "received advertisements on other websites related to her searches and research

conducted on the websites"—but does not allege that her searches and research related to her condition was exclusive to WebMD.com and/or Drugs.com. (*See id.*)

Plaintiffs allege that they do "not have an account on [WebMD.com or Drugs.com], ha[ve] never subscribed to their newsletters, and ha[ve] not consented to any privacy policy that these websites may have published." (Complaint at ¶ 61.) They also both allege that they "did not know that [Defendants were] collecting [their] personal information when [they] visited these websites and never gave [Defendants] consent to intercept [their] communications and collect data about [them]." (*Id.*) Plaintiffs speculate that their "personal information, including their IP address, device information, browsing activity, and persistent UID/XID cookie identifier, was intercepted and collected []." (*Id.* at ¶ 59.)

### C. Privacy and Cookies Disclosures Made by the Websites on Which Plaintiffs' Claims are Premised.

The Complaint makes no allegations regarding the Drugs.com and WebMD.com privacy and/or cookie policies—which were available to Plaintiffs *before* they conducted searches on these websites or moved beyond home pages, and which plainly disclosed the use of third-party cookies and information sharing with third parties. (*See* Request for Judicial Notice ("RJN"), Exs. A-G.)

WebMD.com's Privacy Policy states that: "[w]e and our partners use cookies to collect information about your use of . . . the WebMD Sites, including content you have viewed." (RJN at Exs. A-B.) It further states that: "[w]e and our service providers collect and store information about users' interactions with unaffiliated websites and applications that use our technologies, including cookies and similar tracking technologies. This allows us to infer the presence of a common user or household behind multiple devices." (*Id.*) The WebMD.com Privacy Policy also links to WebMD.com Cookie Policy, which states that: "**[t]hird-party cookies** are placed by someone other than WebMD, and may gather browsing activity across multiple websites and sessions. They are usually

persistent cookies and are stored until you delete them or they expire based on the time period set in each third-party cookie." (*Id.* at Exs. C-D.) The Cookie Policy instructs users that: "[m]ost browser software can be set to reject cookies, and offer instructions on how to reset the browser to reject cookies." (*Id.*)

The Drugs.com Privacy Policy states that: "[t]o the extent that information we collect is health data or other sensitive personal data, we ask for your explicit consent to process the data." (RJN at Exs. E-G.) It further states that: "Drugsite Trust and its partners use cookies or similar technologies to analyze trends, administer the website, track users' movements around the website, and to gather demographic information about our user base in aggregate. You can control the use of cookies at the individual browser level, but if you choose to disable cookies, it may limit your use of certain features or functions on our website or service." (*Id.*)

WebMD.com's and Drugs.com's policies state that information collected from website users includes IP addresses, browser information, search terms, content viewed, unique device identifiers, dates, and times. (*Id.* at Exs. A-G.)

**D. Plaintiffs' Claims and Demands for Relief.**

Plaintiffs' First Cause of Action is for violation of Section 631(a) of CIPA, which essentially prohibits wiretapping. While Plaintiffs do not expressly state which of the four prongs of Section 631(a) their claim is premised upon, they allege that: (1) Defendants "intercept [their] communications" with websites "while they are in transit," and "willfully read, analyze, and learn the contents and meaning of these intercepted communications;" (Complaint at ¶¶ 75-76); (2) they "did not consent to Defendants intercepting, reading, or using their communications," and that "[n]o notice was provided, and no opportunity to consent was given before the interceptions began" (*id.* at ¶ 77); and (3) "Defendants' software, including the Scorecard Tag, is a 'machine, instrument, contrivance' used to collect communications" (*id.* at ¶ 73).

Plaintiffs' Second Cause of Action is for violation of Section 638.51 of

CIPA, which addresses use of a "pen register." They allege that the Scorecard Tag "is a 'pen register' because it is a device or process that records addressing or signaling information, in this instance, Plaintiffs' and Class Members' IP addresses, the websites they visited, derived location information, device identifiers, and other persistent identifiers, from electronic communications transmitted by their devices." (Complaint at ¶ 84.)

Plaintiffs' Third Cause of Action is for violation of Section 632 of CIPA, which essentially covers eavesdropping. Plaintiffs allege that Defendants eavesdropped on their "confidential communications." (Complaint at ¶¶ 88-100.) They contend that "Defendants' Scorecard Tag is an electronic amplifying or recording device" that Defendants used to record and eavesdrop upon communications that Plaintiffs "reasonably expected . . . to remain between themselves and the websites they chose to visit." (*Id.* at ¶¶ 90, 92.) They claim their expectations were objectively reasonable because: (1) Plaintiffs did not have a direct relationship with Defendants; (2) Plaintiffs did not know their data was being shared with parties other than WebMD and Drugs.com; and (3) a disclosure or warning could easily have been provided. (*Id.* at ¶ 94.)

Plaintiffs' Fourth Cause of Action is for violation of the CDAFA. Plaintiffs allege that "Defendants knowingly 'accessed' Plaintiffs' and the Class Members' computers and/or computer systems because they purposefully gained entry to and/or caused output from their computers to obtain personal information, including browsing data, device identifiers, IP addresses, and tracking cookies." (Complaint at ¶ 105.) Plaintiffs further allege that they "suffered damage and/or loss" because: "(1) Defendants' software occupied . . . storage space on their devices without authorization; (2) Defendants' software caused data to be output from [their] devices; (3) Defendants' acts used computer resources of the aforementioned devices; and (4) Defendants were unjustly enriched and profited from the data." (*Id.* at ¶ 106.)

Plaintiffs' Fifth Cause of Action is for violation of the ECPA. They allege that "Defendant intentionally intercepted the contents of [their] electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, CDAFA, and other state wiretapping and data privacy laws, among others." (Complaint at ¶ 122.)

Plaintiffs' Sixth Cause of Action is a common law claim for invasion of privacy, premised on the California Constitution. They allege that they have a legally protected privacy interest in—and a reasonable expectation of privacy to—"their IP addresses, location data, and other routing information . . . when navigating the internet," pursuant to the California Constitution. (Complaint at ¶¶ 131-132, 135.) Thus, Plaintiffs allege, they did not expect that Defendants were "intercepting and monitoring their personally identifiable online activity across multiple websites, let alone using this information for profit." (*Id.*) Plaintiffs further contend—in boilerplate terms—that Defendants' purported conduct "constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person." (*Id.* at ¶ 134.)

Plaintiffs' Seventh Cause of Action is for violation of the "unlawful" and "unfair" prongs of the UCL by violating their "constitutional rights to privacy, state privacy statutes, and state consumer protection statutes," and by "offend[ing] public policy" and engaging in "immoral, unethical, oppressive, and unscrupulous activities." (Complaint at ¶¶ 144-145.) Plaintiffs further allege that Defendants "deprived" them of "valuable data without providing just compensation," yet never identify anything that was taken from them in a finite way nor any conduct that deprived them of use or access to anything at all. (*Id.* ¶ 147.)

Finally, Plaintiffs' Eighth Cause of Action is for common law intrusion on seclusion. They allege that they "reasonably expected that their IP addresses, location data, and other personal information would not be intercepted, collected,

and used by Comscore, a third-party data broker with whom they have no direct relationship." (Complaint at ¶ 154.) Plaintiffs further allege that "Defendants' conduct is highly offensive to a reasonable person because: (a) it violates established social norms and expectations regarding online privacy; (b) it occurs without users' knowledge or consent and provides no opportunity for users to opt out; (c) it creates comprehensive profiles of users' online activities across multiple unrelated websites and across devices; and (d) it monetizes users' personal information for Defendants' commercial gain without their knowledge or compensation." (*Id.* at ¶ 158.) Plaintiffs allege they have suffered "emotional distress from the knowledge that their online activities have been secretly monitored and profiled." (*Id.* at ¶ 159.)

## III. PLAINTIFFS LACK ARTICLE III STANDING.

"For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish Article III standing, a plaintiff must show: (1) that they suffered an "injury in fact" that is both "concrete and particularized" and "actual or imminent"; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. *Popa v. Microsoft Corp.*, 153 F.4th 784, 788 (9th Cir. 2025) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Standing is a jurisdictional requirement, and thus a Rule 12(b)(1) motion is proper where plaintiffs cannot demonstrate standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

A statutory violation—standing alone—is insufficient to establish Article III standing, as the obligation to demonstrate a "concrete" injury is constitutional in nature. *TransUnion*, 594 U.S. at 426. A "concrete" injury must be "'real, and not abstract,'" not merely "procedural." *Id*. at 440. "Traditional tangible harms," such as physical and monetary harms, are concrete injuries for Article III standing purposes. *Id*. at 425. The relevant inquiry under Article III in the privacy context is

whether the alleged invasion was so "highly offensive" as to be actionable at common law. *Popa*, 153 F.4th at 793. But while privacy harms can in *some* instances establish Article III standing, naked or conclusory allegations of an invasion of privacy are insufficient. *See e.g.*, *Maghoney v. Dotdash Meredith, Inc.*, 2026 U.S. Dist. LEXIS 36704 (S.D. Cal. Feb. 23, 2026); *Mitchener v. Talkspace Network LLC*, 2025 U.S. Dist. LEXIS 127525 (C.D. Cal. June 27, 2025). To establish standing, a plaintiff must "identify the 'specific personal information [they] disclosed that implicates a protectable privacy interest.'" *Mikulsky v. Noom, Inc.*, 682 F. Supp. 855, 864 (S.D. Cal. 2023); *see Popa*, 153 F.4th at 791 (finding standing lacking because the information conveyed was not "embarrassing, invasive, or otherwise private []."); *Rodriquez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 927 (C.D. Cal. 2025) ("Not all information will qualify; [it] must be sufficiently personal or sensitive that its disclosure is harmful.").

California courts have "developed a presumption that internet communications do not reasonably give rise to" an expectation of privacy. *Revitch v. New Moosejaw, LLC*, 2019 U.S. Dist. LEXIS 186955 *7 (N.D. Cal. Oct. 23, 2019) (citing and collecting authorities). This is particularly true as to IP addresses, the collection of which "does not cause the kind of harm that can be vindicated in federal court." *Rodriguez v. Brushfire Recs.*, 2025 U.S. Dist. LEXIS 264091 at *20 (C.D. Cal. Dec. 15, 2025) (citing *Carolus v. Nexstar Media Inc.*, 2025 U.S. Dist. LEXIS 92707 (N.D. Cal. Apr. 9, 2025)); *see Maghoney*, 2026 U.S. Dist. LEXIS 36704 at *13. Indeed, "an IP address which cannot identify an individual user and at most conveys general geographic information does not justify [finding a concrete harm sufficient to establish standing]." *Gabrielli v. Insider, Inc.*, 2025 U.S. Dist. LEXIS 28788 at *14 (S.D.N.Y. Feb. 18, 2025); *Heeger v. Facebook*, 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020) (lack of concrete injury because "[p]laintiffs do not plausibly allege anything more than the collection of IP

addresses, and there is no legally protected privacy interest in IP addresses.”).[1]

Here, Singer alleges that he visited Drugs.com and researched medication and “general health information” for an (undisclosed) condition. (Complaint at ¶ 60.) Santucci alleges that she visited WebMD.com and ran searches related to an (undisclosed) injury and related medication, and a (undisclosed) complication related to an (undisclosed) procedure. (*Id*. at ¶ 61.) She also alleges that she visited Drugs.com and researched medication related to an (undisclosed) condition. (*Id*.) Neither alleges when they went to these websites. But, they both admit that **they did not have accounts** on these websites, and thus, there is no allegation or plausible inference that either website was aware of their identities or contact information beyond basic browser signals such as IP address. (*See id*. at ¶¶ 60-61.) Indeed, nowhere in the Complaint do Plaintiffs allege that Defendants learned who they were through any of their online activities. They only allege that Defendants received non-personally-identifiable information through the Scorecard Tag (*i.e.*, IP addresses, device information, browsing data, and a unique UID/XID identifier). (*See id*. at ¶¶ 3, 27.) That is, while Plaintiffs allege that Defendants learned that two devices (associated with IP addresses and unique identifying numbers assigned *by* Defendants) went to certain webpages, they do not allege that Defendants ever learned who owned or was associated with either of those devices.[2]

In the Complaint, Plaintiffs make no attempt to plead any injury in specific terms. They make only a single general allegation that they have been harmed by “loss of control over their personal information, and emotional distress from the knowledge that their online activities have been secretly monitored and profiled.”

---

[1] *See also Saeedy v. Microsoft Corp.*, 2023 U.S. Dist. LEXIS 227915 (W.D. Wa. Dec. 21, 2023); *Ji v. Naver Corp.*, 2022 U.S. Dist. LEXIS 179263 (N.D. Cal. Sept. 30, 2022); *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1049 (N.D. Cal. 2022).

[2] Note that while the Complaint states that geolocation information can be obtained from an IP address, it is well recognized that IP addresses only provide highly generalized location information. *Gabrielli*, 2025 U.S. Dist. LEXIS 28788 at *9-12.

(Complaint at ¶ 159.) For several reasons, this does not satisfy their burden of demonstrating standing. Plaintiffs do not plead that Defendants have learned extensive information about their activities, as they allege only the Defendants learned information about their limited visits to two free-of-charge websites on which they did not have accounts. And while Plaintiffs contend that they did not agree to the privacy policies disclosed by Drugs.com and WebMD.com, these policies were available to Plaintiffs *before* they conducted their searches—and plainly disclosed the use of third-party cookies and the sharing of information with third parties. Moreover, the limited information that Defendants allegedly received vis-à-vis Plaintiffs' browsing activities is not alleged to have contained identifiable information. Plaintiffs do not allege that Defendants received their names, contact information, or other details from which their identities could be learned. Nor do Plaintiffs allege that anything Defendants did with the information they allegedly obtained without consent was so "highly offensive" as to be actionable at common law. Rather, they allege that Defendants use data to develop measurement tools that help advertisers plan for and evaluate advertising campaigns—based on understandings and insights regarding broad demographic groups rather than specific data about a specific consumer or small group of identifiable consumers.

For these reasons, Plaintiffs have failed to establish standing as to any of their claims, though as discussed below, several of their claims also have statutory standing requirements that are likewise relevant to the issue of Article III standing.

## IV. PLAINTIFFS HAVE FAILED TO PLEAD THEIR CLAIMS.

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nonetheless, the Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). Furthermore, "'a plaintiff may plead [them]self out of court'" if they "plead facts which establish that [they] cannot prevail on [their]…claim." *Weisbuch v. Cnty of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997).

### A. Plaintiffs' Cal. Pen Code § 631 Claim Fails as a Matter of Law.

Section 631(a) of the California Penal Code consists of three main clauses which cover "three distinct and mutually independent patterns of conduct:" (1) "intentional wiretapping;" (2) "willfully attempting to learn the contents or meaning of a communication in transit over a wire;" and (3) "attempting to use or communicate information obtained as a result of engaging in either of the two previous activities." *Tavernetti v. Superior Court of San Diego Cty.*, 22 Cal. 3d 187, 192 (1978). The fourth basis for liability under Section 631(a) is for aiding and abetting any person or persons who "unlawfully do, or permit, or cause to be done any of the other three bases for liability." *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021). Here, while not clearly stated, Plaintiffs appear to be pursuing claims based on all three theories of liability, all of which fail.

First, the first clause of Section 631(a), for "intentional wiretapping," applies only to "telegraph or telephone" communications over a wire. *See, e.g., In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 825 (N.D. Cal. 2020)

("Beginning the first clause of § 631(a), Defendants are correct that it protects only communications that are made over a 'wire, line, or cable.' This is evident from the plain text of the statute []."); *Matera v. Google Inc.*, 2016 U.S. Dist. LEXIS 107918, at *57 (N.D. Cal. Aug. 12, 2016) ("The first clause" [] is "limited to communications passing over 'telegraph or telephone' wires, lines, or cables.").

Second, the second clause of Section 631(a), for willfully attempting to learn the contents of a communication in transit over a wire, fails as well. Plaintiffs do not allege that Defendants obtained the contents of their communications to Drugs.com or WebMD.com (or any other website) while those communications were "in transit." Instead, they allege that the Scorecard Tag caused their browsers to send information to Defendants. (Complaint at ¶ 75.) This is fundamentally distinct from what Section 631 prohibits, as Plaintiffs allege that Defendants received an entirely separate electronic signal from what Plaintiffs' browsers sent to the servers of the websites that they visited. Moreover, the information that Plaintiffs allege Defendants received is mere record information, and not the "contents" of a communication. *See Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1082–83 (C.D. Cal. 2021) (Browsing data such as "keystrokes, mouse clicks, pages viewed, . . . the duration of the visit, Plaintiff's IP address, . . . browser type, and the operating system" is not the substantive "contents" of a communication.).

While Plaintiffs vaguely claim they "searched for medication reviews and general health information related to a serious medical condition" and "conducted research relating to a serious injury," they do not provide examples of actual searches they allegedly performed—or even an unambiguous statement that they conducted their searches *on* Drugs.com or WebMD.com rather than linking from search engine results—rendering their allegations deficient. (*Id*. at ¶¶ 60-61); *see Harrill v. Emanuel Med. Ctr.*, 2025 U.S. Dist. LEXIS 109125 at *27 (E.D. Cal. June 9, 2025) (holding "Plaintiff's allegations [in]sufficient to plead the 'contents' of her communications" where she "d[id] not specify or describe the searches [].").

Finally, because Plaintiffs have failed to plead a claim under the first or second prong of Section 631(a), their claim under the third prong necessarily fails.

**B. Plaintiffs' Cal. Pen Code § 638.51 Claim Fails as a Matter of Law.**

California law prohibits the installation of a pen register without obtaining a court order or consent. Cal. Pen. Code § 638.51. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code § 638.50(b). Plaintiffs contend that "Defendants' Scorecard Tag is a "pen register" because it records addressing or signaling information, in this instance, Plaintiffs' and Class Members' IP addresses, the websites they visited, derived location information, device identifiers, and other persistent identifiers, from electronic communications transmitted by their devices." (Complaint at ¶ 84.) The claim fails for several independent reasons.

First—and relevant to the overarching issue of Article III standing—Plaintiffs lack statutory standing. Only persons who have been "injured" by the installation or use of a pen register have standing to sue. *See* Cal. Pen. Code § 637.2 (a) (stating that "[a]ny person who has been injured by a violation of this chapter may bring an action against the person who committed the violation"). That is, regardless of the fact that CIPA contains a statutory damages provision, Plaintiffs must allege not only a violation, but also that the violation resulted in concrete injury to them. *See Miller v. Hearst Communications, Inc.*, 2012 U.S. Dist. LEXIS 109121 at *19-20 (C.D. Cal. Aug. 3, 2012) ("Because Plaintiff fails to allege a cognizable injury, she lacks statutory standing for her…claim, regardless of whether her allegations are sufficient to state a violation of the…law"). As explained in Section III, *supra*, Plaintiffs have failed to make such a showing.

Second, while it is true that Section 638.51 contains broad language, Plaintiffs' expansive definition of a "pen register" takes the statute far beyond its

breaking point. *See Smith v. Maryland*, 442 U.S. 735, 736 n.1 (1979) ("A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released."). Although many federal district courts have defined "pen register" to include website cookies/pixels,[3] California courts have largely rejected Plaintiffs' position. In *Aviles v. Liveramp, Inc.*, the court explained that courts have historically acknowledged that "[a] pen register . . . records the numbers dialed from a telephone." 2025 Cal. Super. LEXIS 776 at *5 (L.A. Super. Ct. Jan. 28, 2025). "The analog of the number dialed by a telephone here is the IP address and related information of a *website* accessed by a computer—but not the computer's own IP address or identifying information." *Id*. (noting that "the category of information collected by pen registers as defined by the statute has [not] been expanded"). In *Aviles*—as here—Plaintiffs alleged that Defendants collected their own IP addresses. Per the court in *Aviles*, however, the "problem with this argument is that it is normal for websites to track the IP addresses of their visitors." *Aviles*, 2025 Cal. Super. LEXIS 776 at *6. "Without alleging that Defendant installed software on *Plaintiff's* device or browser that collected incoming contact information to *Plaintiff's* device, Plaintiff has not alleged anything above and beyond how the internet normally works." *Id*. at *7 (dismissing Section 638.51 claim); *see United States v. Christie*, 624 F.3d 558, 563 (3d Cir. 2010) ("IP addresses are . . . conveyed to websites that an internet user visits, and administrators of websites . . . can see the IP addresses of visitors to their sites. However, site administrators do not possess information linking a given IP address to a particular person."); *see also*, *Licea v. Hickory Farms LLC*, 2024 Cal. Super. LEXIS 66498 at *10 (L.A. Super. Ct. Mar. 13, 2024) (finding "public policy strongly disputes Plaintiff's potential interpretation of privacy laws as one

---

[3] *See e.g. Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

rendering every single entity voluntarily visited by a potential plaintiff, thereby providing [the user's] IP address for purposes of connecting the website, as a violator"); *Sanchez v. Cars.com*, 2025 Cal. Super. LEXIS 710 at *8 (L.A. Super. Ct. Jan. 27, 2025) (cookie that collected device information outside the definition of a "pen register" under CIPA). Thus, Plaintiffs' claims fail as a matter of law.

**C. Plaintiffs' Cal. Pen Code § 632 Claim Fails as a Matter of Law.**

Section 632(a) of the California Penal Code imposes liability against any "person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication." "Confidential communication" is defined as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication . . . in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Pen. Code § 632(c). Here, Plaintiffs allege that "[b]y embedding the Scorecard Tag on publisher websites . . . Defendants eavesdropped upon and recorded website users' confidential communications," which Plaintiffs "reasonably expected . . . to remain between themselves and the websites they chose to visit." (Complaint ¶ 96, 92.)

As stated above in Section III and below in Section IV.F, California courts have "developed a presumption that internet communications do not reasonably give rise to" "an objectively reasonable expectation that the conversation is not being overheard or recorded." *Revitch*, 2019 U.S. Dist. LEXIS 186955 at *6-7 (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776-77 (Cal. 2002)); *see Boulton v. Cmty.Com, Inc.*, 2025 U.S. App. LEXIS 1819 at *3-5 (9th Cir. Jan. 28, 2025); *McGinnis v. community.com, Inc.*, 2023 U.S. Dist. LEXIS 172304 at *6-8 (C.D. Cal. Sept. 25, 2023); *Hubbard v. Google LLC*, 2024 U.S. Dist. LEXIS 117876 at *21-24 (N.D. Cal. July 1, 2024). That the web browsing information Defendants

allegedly learned was related to health information is not sufficient to overcome this presumption. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018). Accordingly, Plaintiffs' written electronic communications with WebMD and Drugs.com were not confidential under Cal. Pen Code § 632 and their claim fails as a matter of law.

Additionally, as explained in greater detail in Section IV.D, *infra*, Plaintiffs have failed to allege that Defendants acted with the requisite intent, and the defenses explained in Section IV.B, *supra*, are also applicable here.

**D. Plaintiffs' CDAFA Claim Fails as a Matter of Law.**

The CDAFA makes it unlawful for a person to: (1) "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to . . . wrongfully control or obtain money, property, or data"; (2) "knowingly access[] and without permission take[], cop[y], or make[] use of any data from a computer, computer system, or computer network"; or (3) "knowingly and without permission access[] or cause[] to be accessed any computer, computer system, or computer network." Cal. Penal Code § 502(c)(1), (2), (7).

Here, Plaintiffs contend that Defendants "purposefully gained entry to and/or caused output from [Plaintiffs'] computers to obtain personal information, including browsing data, device identifiers, IP addresses, and tracking cookies." (Complaint ¶ 105.) Plaintiffs contend that they have been damaged in that the "small text file" (*i.e.*, the Scorecard Tag): (1) "occupied [] storage space on their devices," (2) "caused data to be output," (3) "used computer resources," and (4) "unjustly enriched" Defendants. (*Id*. at ¶ 106.)

To bring a claim under CDAFA, the owner of the data must adequately allege "damage or loss by reason of a violation" of the statute. Cal. Penal Code § 502(e)(1). Plaintiffs make no such allegations. Their contention that they have been damaged because a "small text file" took up space on their devices is entirely implausible, as all website browsing activity involves the download of information,

and there are no allegations that they somehow ran out of storage space. Nor do they allege how they have been damaged by the output of data that they admit intentionally sending to publishers. Likewise, while they largely focus on an "unjust enrichment" theory, they never allege that they suffered any type of tangible economic loss. *See Doe I v. Google LLC*, 741 F. Supp. 3d 828, 846 (N.D. Cal. 2024) (finding "plaintiffs' allegations of lost storage, disk space, and performance" inadequately pled). Nor could they, as Plaintiffs' allegation that Defendants deprived them of the value of their data is entirely conclusory, and they fail to allege that they had any intention or ability to sell their data. *See Heiting v. Taro Pharms. USA, Inc.*, 709 F. Supp. 3d 1007, 1021 (C.D. Cal. 2023) (finding that "loss of control over personal data" is not "contemplated by the CDAFA" and "that the CDAFA's private right of action contemplates some *damage to the computer system, network, program, or data contained on that computer*, as opposed to data generated by a plaintiff while engaging with a . . . website") (emphasis added). Plaintiffs' vague assertion that they suffered damage is even further undercut by their admission that Defendants did not know who they were and could not link any information to their names. (*See* Complaint at ¶ 25.)

Second, Plaintiffs have failed to plausibly allege that Defendants "knowingly" obtained any data from them "without permission." As explained above, Plaintiffs have intentionally failed to identify or describe the disclosures made to them when they accessed the websites upon which their claims are based. Worse still, even assuming such disclosures were inadequate, Plaintiffs never allege that Defendants had any reason to believe that Plaintiffs were unaware that the information that they voluntarily shared with publishers could be obtained by Defendants. Fundamentally, Plaintiffs knowingly and intentionally visited the websites referenced in the Complaint and gave those publishers and their partners (including Defendants) access to data about their use of the websites. *See Tsering v. Meta Platforms, Inc.*, 2026 U.S. Dist. LEXIS 5762, at *12 (N.D. Cal. Jan. 12,

2026) (finding the plaintiff's conclusory allegations "insufficient, without more, to raise a plausible inference that [Defendants] knew the third-party [publishers] had not sought permission from the users to access" the data they shared).

**E. Plaintiffs' ECPA Claim Fails as a Matter of Law.**

The ECPA prohibits the intentional interception, use, or disclosure of "any wire, oral, or electronic communication." *See* 18 U.S.C. §§ 2520, 2511, 2510. Under the one-party consent exception, liability does not attach "where one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(d). This exception does not apply if the interception occurred "for the purpose of committing any criminal or tortious act." *Id.*

Here, Plaintiffs contend that Defendants violated 18 U.S.C. § 2511(1)(a) and (d) by "utilizing the Scorecard Tag and other tracking technologies" to "intercept communications . . . regarding their sensitive medical and health information," which Defendants then "monetized for targeted advertising purposes." (Complaint at ¶¶ 119, 120.) Plaintiffs admit in the Complaint that "[p]ublishers **agree** to install Comscore's tags in exchange for access to audience measurement data about their own websites." (*Id*. at ¶ 26 (emphasis added).) And certainly, nothing in the Complaint so much as hints that Defendants secretly installed their technology on the websites Plaintiffs allege that they visited (or any website). Accordingly, the one-party consent exception applies. *See, e.g.*, *Doe I*, 741 F. Supp. 3d at 842. Plaintiffs' conclusory allegation that Defendants intercepted their data for the "purpose of committing a criminal or tortious act" in violation of Plaintiffs' other causes of action is insufficient to rebut their acknowledgment of[4] one-party consent. *See Sussman v. Am. Broad. Co.*, 186 F.3d 1200, 1202-03 (9th Cir. 1999) ("Where the *purpose* is not illegal or tortious . . . the victims must seek redress

[4] Noted above, Drugs.com and WebMD.com have privacy and/or cookies policies that provide specific disclosures. The arguments raised above regarding CIPA are largely applicable here.

elsewhere.") (emphasis added); *see also Saedi v. SPD Swiss Precision Diagnostics GmbH*, 2025 U.S. Dist. LEXIS 83660 at *38 (C.D. Cal. Feb. 27, 2025).

**F. Plaintiffs' Common Law Claims Fail as a Matter of Law.**

The elements of a claim for invasion of privacy under the California Constitution are: "(1) the [plaintiff] possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is 'so serious as to constitute an egregious breach of social norms' such that the breach is 'highly offensive.'" *Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.)*, 956 F.3d 589, 601 (9th Cir. 2020) (quoting *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009)); *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35–37 (1994).[5] The elements of intrusion upon seclusion are: (1) a defendant "intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy," and (2) that the intrusion was "highly offensive" to a reasonable person. *Hernandez*, 47 Cal. 4th at 286. For both claims, the defendant's violation of the plaintiff's rights must be intentional. *See Briskin v. Shopify Inc.*, 2026 U.S. Dist. LEXIS 11317 at *13-15 (N.D. Cal. Jan. 21, 2026). In light of this similarity, courts regularly consider these claims collectively. *See id.*; *In re Facebook Inc. Internet Tracking Litig*., 956 F.3d at 605.

California law establishes a "high bar for an invasion of privacy claim." *Belluomini v. Citigroup, Inc.*, 2013 U.S. Dist. LEXIS at *20 (N.D. Cal. July 23, 2013). "[D]ata collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy." *Tsering*, 2026 U.S. Dist. LEXIS 5762 at *22-23 (citing *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022), *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (dismissing intrusion on seclusion claim regarding receipt of browsing

[5] The first prong — "[w]hether a legally recognized privacy interest is present in a given case [—] is a question of law to be decided by the court." *Hill*, 7 Cal. 4th at 40.

history and data)); *see also Heeger*, 509 F. Supp. 3d at 1189 (finding no legally protected privacy interest in IP addresses). "Contemporary internet browsing involves the collection of users' data, including by tracking users across the internet, *and a reasonable user should expect as much*." *Hubbard*, 2024 U.S. Dist. LEXIS 117876 at *22; *Esparza v. Kohl's Inc.,* 723 F. Supp. 3d 934, 945-46 (S.D. Cal. 2024) (browser history is not sensitive, personally identifiable information). And to be clear, searches on publicly available medical websites are not so sensitive as to give rise to an invasion of privacy claim. *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) ("We do not agree that the collected data is so different or sensitive. The data show only that Plaintiffs searched and viewed publicly available health information that cannot, in and of itself, reveal details of an individual's health status or medical history.")

In light of these authorities, Plaintiffs' claims fail for several reasons. First, as explained above, they have not alleged that Defendants *intentionally* violated Plaintiffs' privacy interests. Second, relevant authorities are clear that Plaintiffs could not have had an objectively reasonable expectation that their browsing and searching on free-of-charge websites such as Drugs.com or WebMD.com—sites they had no account on and were not logged into—would be kept confidential. Third, Defendants' alleged receipt of the limited categories of anonymous and non-personally-identifiable information alleged in the Complaint was not "highly offensive"—particularly in light of the disclosures made in the Drugs.com and WebMD.com privacy policies.

### G. Plaintiffs' UCL Claim Fails as a Matter of Law.

In their Seventh Cause of Action, Plaintiffs attempt to assert claims under the "unlawful" and "unfair" prongs of the UCL. These theories of liability fail.

First, Plaintiffs' only theory of harm is that they have "lost money or property, including but not limited to valuable consideration, *e.g.*, access to and control of their private and personal data." (Complaint at ¶ 147.) They contend—

without elaboration or specificity of any kind—that their web browsing data has value, and that they have not been compensated for Defendants' access to it. (*Id.*) This is insufficient as a matter of law to plead a claim. Moreover, their conclusory statement that they have lost "access" to data regarding their own web browsing activities is unsupported by any factual allegations in the Complaint.

The UCL limits standing to those who have "suffered injury in fact and lost money or property as a result of . . . unfair competition." Cal. Bus. & Prof. Code § 17204. Thus, "[t]o satisfy the narrower standing requirements imposed by [§ 17204], a party must [] (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact [] and (2) show that the economic injury was the result of, i.e., *caused by*, the unfair business practice [] that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis in original). Critically, "no federal court has wedged individual digital data into the UCL's 'money or property' box." *Rodriguez v. Google LLC*, 2021 U.S. Dist. LEXIS 98074 at *29 (N.D. Cal. May 21, 2021). "The relevant inquiry is not whether Defendant[] can profit from Plaintiff's personal information, but whether Plaintiff himself can profit from his own data." *Greenley,* 684 F. Supp. 3d at 1054. "Courts in this District have held that to proceed on an economic injury theory, data privacy plaintiffs must allege the existence of a market for their data and the impairment of the ability to participate in that market." *Ji*, 2022 U.S. Dist. LEXIS 179263 at *28-29 (citing *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1040 (N.D. Cal. 2019) ("It is not enough to merely say the information was taken and therefore it has lost value []. That the information has external value, but no economic value to plaintiff, cannot serve to establish that plaintiff has personally lost money or property.")).

Here, Plaintiffs do not allege any attempt or intention to market or sell their web browsing information, nor do they provide any "specific allegations regarding the value of the information." *Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732,

748 (N.D. Cal. 2023) ("Numerous courts have held that disclosure of personal information alone does not constitute economic or property loss sufficient to establish UCL standing, unless the plaintiff provides specific allegations regarding the value of the information."). Indeed, the implication that Plaintiffs could have somehow monetized the data Defendants' allegedly received—which Plaintiffs' provided to Drugs.com and WebMD.com for free—is conclusory and speculative.

Second, the viability of a UCL claim under the "unlawful" prong stands or falls with the underlying claims because a "claim under [the unlawful] prong hinges upon whether a plaintiff can formulate a claim under the predicate law." *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021) (citing *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1094 (N.D. Cal. 2017)). Here, because Plaintiffs have failed to adequately plead any of their underlying claims, their unlawful-prong UCL claim necessarily fails as well. *See Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (2005) ("'If the [underlying] claim is dismissed, then there is no 'unlawful' act upon which to base [] the derivative Unfair Competition claim'") (second alteration in original).

Third, Plaintiffs' UCL claim under the "unfair" prong "cannot survive [because it] overlap[s] entirely with the business practices addressed in the [other] prongs of the UCL," and "the claims under the other [] prongs of the UCL do not survive." *Hadley*, 243 F. Supp. 3d at 1105 (citations omitted). In other words, because Plaintiffs' allegations that Defendants' actions are unfair mirror their allegations that Defendants' actions are unlawful, and Plaintiffs' unlawful claim under the UCL fails, Plaintiffs' unfair claim under the UCL also fails. *Id.*

## V. CONCLUSION.

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint in full and without leave to amend.

Dated: April 17, 2026

VENABLE LLP

By: /s/ Jean-Paul P. Cart
Jean-Paul P. Cart

*Attorneys for Defendants, Comscore, Inc. and Full Circle Studies, Inc.*

**CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2**

The undersigned, counsel of record for Defendants Comscore, Inc. and Full Circle Studies, Inc., certifies that this brief contains 8,361 words and complies with the limit set by the Court's New Case Order dated February 11, 2026. (Dkt. 14, § 3.A.)

Dated: April 17, 2026

VENABLE LLP

By: /s/ Jean-Paul P. Cart
Jean-Paul P. Cart

*Attorneys for Defendants, Comscore, Inc. and Full Circle Studies, Inc.*